## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL DOCKET NO. 86-137** |
| v. | * | SECTION: "N" |
| **ALEXANDER HENRI LEGAULT** | * | |
| a/k/a Walter Roy Barr | | |
| a/k/a Paul Dietrich | * * * | |

### FACTUAL BASIS

The United States through witness and documentary evidence can establish beyond a reasonable doubt the following factual basis for the offenses set forth in Counts 1 and 8 of the indictment in the above-captioned case involving conspiracy to commit wire and mail fraud in violation of Title 18, United States Code, Section 371 and aiding in the making of a false and fraudulent bill of lading in violation of Title 49, United States Code, Section 121. Defendant **ALEXANDER HENRI LEGAULT ("LEGAULT")** and his counsel Robert Glass, have read the factual basis, agree substantially with its accuracy and acknowledge that the factual basis establishes defendant's guilt as to Counts 1 and 8.

Defendant LEGAULT had work experience in the food commodities business and education in international financing. Co-conspirator Alphonse Joseph Demots, Jr. ("Demots") had work experience in the food commodities business and as a freight forwarder.

In 1980, after establishing a company Albury Sales in South Florida, LEGAULT and Demots entered into the international food commodities business with companies and countries in the Middle East.

After contracting to sell a substantial quantity of Mazola Corn Oil to a company in the Middle East, LEGAULT and Demots provided false documentation misrepresenting that Mazola Corn Oil was being furnished, when in fact, LEGAULT and Demots furnished a less expensive brand of corn oil but had created Mazola Corn Oil labels for the various shipping containers. After civil law suits were filed and a judgment rendered against Albury, LEGAULT and Demots, these two individuals ultimately moved their operation to the New Orleans Metropolitan area in January/February 1981. In setting up that business, LEGAULT used the aliases Walter Roy Barr and on occasion Paul Dietrich and Demots used the alias William J. Noon and on occasion Paul Dietrich. Their businesses operated under the names Southern Federated Cooperatives, Inc., Century Investments and Sea Freight Corporation using a mail drop and a telephone answering service at One Canal Place in downtown New Orleans, Louisiana. LEGAULT and Demots actually operated out of a Metairie, Louisiana apartment.

LEGAULT and Demots rented an international telex machine and had stationery created for SFC. The logo for SFC falsely represented that the company had plants in several states. LEGAULT and Demots began sending international telex messages to various Middle-Eastern countries advertising the sale of different consumer items, including paper towels, eggs, tuna, and

frozen chickens. LEGAULT and Demots found Middle-Eastern buyers for each of those commodities, negotiated terms and selling prices by international telex machine, and required each buyer to obtain a letter of credit through an established international bank. The contract and shipping specifications for each commodities sale were set forth in the bill of lading and commercial invoice. LEGAULT and Demots had to present documentation establishing compliance with the contract and shipping specifications before the buyer's financial institution would honor the letter of credit and pay LEGAULT and Demots the proceeds from the buyer. LEGAULT and Demots and others at their request, assisted in creating false documents to make it appear that SFC had complied with the terms of the bills of lading and the letters of credit so that payment would be made by the financial institutions without true compliance.

In the charged offense, LEGAULT and Demots contracted to sell 5,000 metric tons of frozen chickens under certain specifications to the government of Egypt for a price net the brokerage fee of $7,046,943.70. Altoun Middle East Enterprises, Limited, brokered the transaction and Chemical Bank and Bank Misr of Egypt established the line of credit to pay the $7,412,488.00 purchase price, brokerage fee, and banking fees for the chickens. LEGAULT and Demots caused a bank account to be opened at Atlantic National Bank of West Palm Beach, Florida, where the proceeds were wired into the account of SFC.

As a part of the scheme, LEGAULT and Demots created false and fraudulent documentation to make it appear that 5,000 metric tons of chickens meeting the contract specifications were on board the M/S Snowland, a Swedish vessel, and sailing as of May 15, 1981 from the Port of New Orleans to an ultimate destination at a designated port in Egypt. Those fraudulent documents included: (1) a bill of lading in the name of Sea Freight Corporation; (2) A fictitious "official"

certificate of a private salvage company falsely certifying the presence of the cargo of 5,000 metric tons of frozen chicken aboard the M/S Snowland; (3) An "official" certificate issued by the Bismilla Islamic Center certifying, without any inspection, that the frozen chickens had been slaughtered according to certain Islamic religious rites; (4) A fictitious "official" veterinary certificate and survey certificate reputedly issued by the United States Department of Agriculture certifying the conditions of the chickens; and (5) A fictitious "official" certificate from a fictitious company, Gulf Coast Testing Laboratories, certifying that the condition of the 5,000 metric tons of chickens allegedly aboard the M/S Snowland met contract specifications.

While Demots remained in the Metairie apartment to respond to telex messages from the broker and/or buyer of the chickens, LEGAULT carried the fraudulent documentation to London, England and had the documents submitted to Chemical Bank of London to fraudulently establish compliance with the letter of credit. Not detecting the fraud, Chemical Bank wire transferred $7,046,943.70 on or about May 26, 1981, to the SFC account at Atlantic National Bank. Soon after, the majority of those funds were immediately transferred out of that account into the trust account of a co-conspirator. Demots then attempted to wire transfer $2,000,000.00 of the proceeds to a bank in the Grand Cayman Islands where the funds were to be shared by Demots, LEGAULT, and others. After the Cayman Islands bank refused to accept the funds for failure to designate the name of the beneficiary of the funds, and returned those funds to the trust account of the co-conspirator, Demots and LEGAULT caused $1,500,000.00 to be wire transferred to another Grand Cayman Islands bank on June 3, 1981.

To make it appear that LEGAULT and Demots were attempting in good faith to comply with the contract, after LEGAULT and Demots gained control of the $7,046,943.70 through the

submission of the false and fraudulent documents to Chemical Bank, LEGAULT and Demots caused part of those proceeds to be used to purchase approximately 3,200 metric tons of frozen chicken from a poultry farm in Mississippi. After the May 15, 1981 date specified in the bill of lading for shipping the chickens, LEGAULT and Demots did cause approximately 2,800 metric tons of the purchased chickens to be loaded on board two vessels in the Port of New Orleans to be transported to Egypt. The remaining 400 metric tons of chickens purchased were in cold storage in New Orleans.

Though Demots claimed to reserve an option to purchase an additional 1,000 metric tons of chickens, in fact, he never attempted to exercise any such option. Rather, Demots and LEGAULT caused the $1,500,000.00 to be transferred to an offshore bank account.

Because LEGAULT and Demots had obtained the $7,046,943.70 by fraud, and the 3,200 metric tons of chickens did not meet contract specifications nor were they shipped timely, the Egyptian government refused to take possession. The 1,800 metric tons of chicken which were never purchased were valued at approximately $2,529,000.00.

During the course of and in furtherance of this scheme, LEGAULT and Demots caused the United States mails to be used when the company owning the telex machine, TRT Communications, mailed monthly bills for the rental services to Century Investments at the Metairie, Louisiana apartment address from April 1981 through June 1981. LEGAULT and Demots paid for the monthly rental services by using the United States mails.

In April 1981, LEGAULT and Demots caused telex messages to be sent in foreign commerce to the broker Altoun in negotiating the contract for the frozen chickens. Chemical Bank of London

and Altoun Middle East Enterprises had to reimburse Egypt the $7,046,943.70 fraudulently obtained by LEGAULT and Demots.

During this same period, LEGAULT and Demots were involved in other fraudulent international-food commodity-contract schemes with Middle Eastern countries and/or companies, using false documentation including bills of lading to obtain funds from financial institutions issuing letters of credit. On March 19, 1981, LEGAULT and Demots caused $27,531.88 to be wire transferred into the Atlantic National bank account of SFC under a contract requiring the sale and delivery of 1,000 cartons of paper towels. While ultimately paper towels were purchased with the some of those proceeds, delivery was never made to the buyers nor was a refund paid.

On March 30, 1981, LEGAULT and Demots caused $140,009.75 to be wire transferred into the Atlantic National Bank account of SFC as payment for 5,000 cases of eggs that LEGAULT and Demots fraudulently represented were onboard certain vessels and being transported to the Middle East. Ultimately, $27,824.00 of the fraudulently received funds were used to purchase 1,450 cases of eggs which were shipped to the buyer but found not to be in compliance with the contract.

On June 4, 1981, LEGAULT and Demots caused $51,190.59 to be wire transferred into the Atlantic National Bank account of SFC as payment for 1,500 cases of tuna that LEGAULT and Demots fraudulently represented through false documents and a fraudulent bill of lading were onboard a specified vessel and en route to the Middle East. The buyers never received the tuna or obtained a refund of their money.

Once LEGAULT and Demots had secured the proceeds from these commodity sales, both defendants left the New Orleans metropolitan area. LEGAULT ultimately fled with his Canadian wife to Montreal, Canada. LEGAULT successfully opposed extradition by the United States. He

also successfully defended against deportation proceedings by the Canadian government until a 2002 Order was entered by the Canadian court requiring LEGAULT to appear on May 30, 2003 at the airport in Montreal, Canada for deportation. LEGAULT failed to appear, and became a fugitive from justice until October 2, 2008, when arrested by law enforcement. At the time of his apprehension, LEGAULT had false identification documentation in the name of Carl Lavigne.

_____
HARRY W. MCSHERRY    (Date)
Assistant United States Attorney

_____
ROBERT GLASS  (Date)
Attorney for Legault

_____
ALEXANDER HENRI LEGAULT   (Date)
Defendant